# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NICHOLAS MASCIA,<br>      Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner<br>Social Security Administration,<br>      Defendant. | CIVIL ACTION<br>No. 08-40105-TSH |

## MEMORANDUM OF DECISION AND ORDER ON THE MOTION TO REVERSE THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY (Docket No. 15) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING COMMISSIONER (Docket No. 18)

**March 25, 2013**

**HILLMAN, D.J.**

### Nature of the Case

Plaintiff, Nicholas Mascia ("Mascia" or "Plaintiff"), has brought this action against the Defendant, Michael J. Astrue, as Commissioner of Social Security Administration ("Commissioner") seeking judicial review of a final decision by the Commissioner denying his application for Social Security Disability Insurance benefits ("SSDI"). The Commissioner denied Mascia's application for benefits on the grounds that he failed to establish that he became disabled prior to December 31, 1996 (when his insured status expired). Mascia argues that Commissioner's decision to deny him SSDI is not based upon substantial evidence and, therefore, should be reversed. Specifically, he argues that the Administrative Law Judge ("ALJ") found that his subjective complaints were not credible without supporting that finding with specific facts

and substantial evidence. He further argues that the ALJ did not properly consider the extent to which the side effects of his various medications affect his ability to work. The Commissioner has filed a motion for an order affirming the decision on the grounds that the Commissioner's finding was supported by the substantial evidence and adequately assessed Mascia's credibility regarding his claims of disabling symptoms.[1]

## Procedural Background

Mascia filed an application for SSDI on January 31, 2006; he claimed his status as a disabled individual commenced on January 10, 1991. *Tr.*, at 131-33. The application was denied by the Social Security Administration ("SSA") on April 6, 2006. Ultimately, Mascia was granted a hearing before an ALJ, which was held on July 18, 2007. The ALJ issued a decision denying benefits on August 30, 2007. Mascia exhausted his administrative remedies and after the denial of benefits was finally affirmed, filed a civil action. However, the SSA could not locate the administrative record and therefore, the matter was remanded for a new hearing. The remand hearing was held on July 7, 2009; a decision denying benefits was issued on September 25, 2009. After the ALJ's decision was affirmed, Mascia filed a motion to re-open this action.

## Findings of Fact

The ALJ determined that the claimant last met the insured status requirement of the Social Security Act ("Act") on December 31, 1996. Neither party disputes this finding.

*1. Educational, Occupational and Personal History*

Mascia was born on January 12, 1951. He graduated from high school and obtained a journeyman plumber's license. *Tr.*, at p. 577, 579. He had been a journeyman plumber/heating

---

[1] A copy of the Administrative Transcript ("*Tr.*")(Docket No. 14) has been provided to the Court under seal.

specialist from about 1981 until he injured his back in an accident in January 1991. *Id.*, at p. 580. He subsequently underwent lumbar fusion surgery. His plumber's license is inactive and he has not worked at all since he was injured in 1991. *Id.* He can read and write English, is married, approximately 5' 8" tall, and weighs 230 pounds. *Id* . Mascia's past relevant work, *i.e.,* work that he was performing as of the date last insured, can been characterized as skilled work performed at the heavy exertional level. *Id.*, at 608.

### 2. *Daily Activities*

During the relevant period, Mascia would drive on occasion, sometimes to the market. *Tr.,* at 580. He drove to the hearing. *Id.* Mascia testified that he is unable to do very much—he sometimes cooks for himself, depending on how he feels. Essentially, "the pain controls [his] life". *Id.* He does not do his own laundry. As far as bathing and grooming himself, he sometimes has problems and is unable to put his pants or socks on. *Id.*, at 585. He is able to manage his own finances, has no physical hobbies and does not belong to any social clubs or other kinds of organizations. *Id.* He testified that he walks with a cane, is unable to leave the house, and can't walk for more than fifteen or twenty minutes or stand comfortably. *Id.*, at 585-86. He can lift and carry ten pounds comfortably. *Id.,* at p. 587. He has no problem picking up small objects, such as papers, pencils and pens. *Id.*

A couple of weeks prior to the hearing, he had gone to Pennsylvania for a vacation. He drove up with his wife and they stayed for three days. *Id.*, at p. 585. Since 1991, he has taken other trips and vacations, including trips to New Mexico where his mother-in-law lives. *Id.*, at p. 586.

*3. Medical History*

Mascia alleges that his medical problems involve his back and left leg.  *Id.,* at p. 581.  On December 7, 1994, he had surgery on his back which was not successful in alleviating his pain.  *Id., at 581*   Other treatments include medication and physical therapy; Mascia has elected not to have further surgery. *Id.*   Mascia testified that on scale of 1-10 with 10 being the most severe, without taking medication, his pain level is 10.  *Id.*, at 582.   When taking pain medication, Mascia rates his pain level as 9. *Id.*

Mascia testified that he suffered a heart attack when receiving injections in his back in 1997[2].  *Id.,* at 583.   As a result, he carries nitroglycerin and takes atenolol.  He used the nitro a "few times" within the ten years prior to his hearing, but was vague as to the actual number of times. *Id.*   Mascia also testified that he has rheumatoid arthritis, although he also testified that medical personnel can't diagnosis what the problem is relating to pain in his shins and legs. *Id.*, at 584.

*4. Medical Findings*

Dr, Marc Linson of the Baysate Medical Center ("Baystate") saw Mascia on September 10, 1992. He noted that Mascia had persistent low back, left buttock and leg pain, which was unresponsive to conservative care.   An MRI showed a decreased T-2 signal at 3-4; bending films were abnormal.   Dr. Linson noted that Mascia's past medical history was essentially negative. He

---

2 It is uncontested that to the extent that Mascia suffers from any heart ailment, those issues arose after the date through which he was last insured.   However, given the issues regarding his credibility, I will note that medical records from Fallon Clinic dated March 30, 2005 indicate that at some point there was a question as to whether Mascia had coronary artery disease, but while "a nuclear imaging study show[ed] some potential ischemia in the inferior wall[,] [h]e has never had a true myocardial infarction," *i.e.,* he has never had a heart attack. *Tr.*, at p. 263.   He was diagnosed with "exertional angina," which has resolved since he has been taking atenolol. *Id.* The fact that Mascia has never had a heart attack is repeated throughout his medical records from Fallon Clinic.

further noted that Mascia presented as normal, except that his back motion was half normal. *Id.*, at 208. The last time that Dr. Linson saw Mascia was 1993. *Id.*, at 482.

On November 2, 1994, Harold A . Wilkinson, M.D., Ph.D., a neurosurgeon, noted that after a long trial of non-surgical therapy, Mascia had requested interbody-face fusion with cable stabilization. Dr. Wilkinson pointed out that good pain relief was achieved in only 70% of patients. *Id.,* at 241. Dr. Wilkinson performed the surgery. In a note dated November 26, 1996, Dr. Wilkinson stated that Mascia had reported that the beneficial results from his second per-radicular steroid injection six months prior had largely faded. Mascia had leg pain and needed more Advil. The TENS device had been helpful. In a note dated, November 14, 1997, Dr. Wilkinson noted that Mascia was reporting mid lumbar pain which restricted his activity and that a CT scan showed good fusion and no obvious abnormality. Dr. Wilkinson noted that the source of his pain is unclear. *Id.*, at 516. In a note dated March 10, 1998, Dr. Wilkinson stated that severe lower back pain and radiating pain from left knee to dorsal foot had caused restrictions on his activity. He noted that wearing a back brace helped with the pain and that Mascia takes ibuprofen, but is reluctant to take pain medication. A CT scan showed excellent healing with no evidence of nerve root compression, but some degenerative changes and disc bulging at L4-5 and at L5-S1 facets. *Id.*, at 514. Dr. Wilkinson further noted that the precise source of Mascia's pain remains elusive, but recent studies suggested he may have some symptomatic inflammatory arthritis L4-5 level. He also noted that much of Mascia's pain was likely to be secondary to chronic de-conditioning. *Id.,* at 514. *Id.*, at 514. As of March 10, 2006, Dr. Wilson had not seen Mascia since 1998. *Id.*, at 484.

Dr. Wilkinson referred Mascia to an evaluation by the UMASS pain control center. However, it appears Mascia did not agree with the initial evaluation that his pain was mostly

mechanical and muscular in nature and therefore, he left before the final evaluation. During the initial evaluation, the resident had suggested that there were certain medications which may be useful to Mascia. *Id.*, at 213-15.

Drs. Nancy Liu, Associate Professor of Clinical Medicine at UMASS and Rathika Martyn, a fellow in rheumatology, evaluated Mascia in October 1996. They noted that Mascia had suffered a work related injury to his lower back and had undergone an L3-4 body and facet joint fusion two years earlier. Mascia reported that he had considerable relief in pain since his surgery, but was still suffering a considerable amount of chronic lower back pain that bothered him and interfered with his day to day activities. Mascia reported that the pain worsened when he was active and was tolerable when he was sedentary or at rest. He was able to walk about three miles a day. He also reported that the pain sometimes involved his lower left thigh and at times felt numbness and tingling below his knee. Review of an MRI and a recent CT scan showed no disc herniation or impingement. Based on their total findings, the assessment was chronic pain syndrome with no further surgery warranted or planned. A low dose of Elavil was prescribed and he was advised to start using his TENS unit *Id.,* at 224-227.

In March 2006, Dr. Hom, a state agency physician, reviewed Mascia's medical records and concluded that he remained able to do light work through his date last insured. *Id.*, at 487-93. In July 2006, a second reviewing physician, Dr. Perel, concluded that Mascia could do light work (with a few non-exertional limitations, through the end of 1996. *Id.*, at 500-06.

Mascia was seen by Dr. Philip Lahey, Jr., an orthopedist, on June 26, 2006. Dr. Lahey noted that Mascia has had no active treatment for his back since 1997 when he had a heart attack.

*Id.*, at 495[3].   Dr. Lahey noted that as of June 26, 2006, Masci complained of numbness in his lower left leg, pain on bending and occasional loss of sensation in his entire left leg.   He also had constant pain in his lower back. He is unable to sit for prolonged periods of time because of the pain. *Id.*, at 496.   Dr. Lahey opined that Mascia is totally and permanently disabled as a result of his conditions and surgery. He noted that Mascia has arthritis in his left knee which he does not believe is related to his back issues, but that a meniscus tear suffered a year and a half prior would be related. Dr. Lahey concluded that "the back injury of 1991 would be considered a major cause of this disability". *Id.*, at 497.

On March 20, 2007, Mascia saw Dr. Vincent Giustolisi, an orthopaedic surgeon and consultant.   Dr. Giustolisi noted that Mascia's main complaint was ongoing lower back pain, which Mascia described as constant.   Mascia described that pain as ranging from 6 out of 10 (with 10 being worse) on a good day, and 10 out of 10 on a bad day. He also complained of constant numbness in his middle back (more on the right side) and periodic decreased strength in his lower left leg.   Dr. Giustolisi opined that Mascia is totally and permanently disabled from any employment due to problems with his lower back. *Id.*

*5. RFC Assessments*

On April 5, 2006, Disability Determination Services ("DDS") did an RFC assessment of Mascia. DDS concluded that Mascia had the following limitations: He could occasionally lift 20 pounds; frequently lift and or carry up to 10 pounds; stand or walk (with normal breaks) up to six hours in an eight hour day; sit (with normal breaks) for up to 6 hours in 8 hour day; unlimited pushing and pulling (with already noted weight limitations).   As to postural limitations, it was

---

3 The source of Dr. Lahey's statement that Mascia had a heart attack in unclear; however, the reference is in quotes so one can infer that Dr. Lahey is repeating what Mascia told him. *See Tr.* at 495.

determined that Mascia could occasionally climb ramps, stairs, ladders, ropes and scaffolds, and, occasionally balance, stoop, kneel, crouch and crawl.  *Id*, at 487-88.   No manipulative, visual or communicative restrictions were noted.   No environmental limitations were noted, other than to avoid concentrated exposure to hazards, such as machinery and height. *Id.*, at 489-90.

It was noted that Mascia suffered from chronic back pain and that steroid injections had provided limited relief. It was also noted that as of January 1995, Mascia was pleased with his progress, but still had some tingling discomfort in his lower left leg. *Id.*, at 487.   As of June 1996, he was almost totally relieved of pain—he could ride his horse gently with aid of a corset. As of October 1996, he could walk 3 miles a day.   He was still experiencing leg pain in his lower left leg and also in his left thigh and had decreased sensation below the knee. *Id.*, at 488.   He was assessed as being reasonable for light limitations. *Id.*

A second RFC assessment done on July 31, 2006, concluded that Mascia had the following limitations: He could occasionally lift 20 pounds; frequently lift and or carry up to 10 pounds; stand or walk (with normal breaks) up to 6 hours in an 8 hour day; sit (with normal breaks) for up to 6 hours in 8 hour day; unlimited pushing and pulling (with already noted weight limitations). *Id.*, at 500.   As to postural limitations, it was determined that Mascia could occasionally climb ramps, stairs, ladders, ropes and scaffolds, and occasionally stoop, kneel, crouch and crawl.   He could balance frequently. *Id.,* at 501.   No manipulative, visual or communicative restrictions were noted.   No environmental limitations were noted, other than to avoid concentrated exposure to hazards, such as machinery and height *Id.*, at 502-503. It was determined that light RFC was appropriate. *Id.,* at 501.

*6. VE's Testimony*

The ALJ presented the VE with a number of hypotheticals. Initially, he asked the VE to assume the following facts:

- An individual of the Mascia's age, education and work experience—focusing on the age of less than fifty.

- The individual is limited to sedentary work, allowing for a sit/stand option at will, or should not: (i) entail more than occasional, *i.e.,* up to one third of the time, use of ramps, stairs, stooping, crouching, crawling or kneeling; (ii) involve work performed at heights using ladders, ropes or scaffolding; (iii) entail any overhead lifting or reaching; (iv) be outside the environments having more than incidental exposure to extremes of cold or vibration; or (v) entail the operation of left foot or leg controls.

- The work should be simple and unskilled in nature.

The VE testified that the individual would not be able to perform Mascia's past relevant work. Although the sit/stand option limited the number of job options available, such an individual would be able to work as: (i) an addresser, that is, someone who addresses correspondence (approximately 300 such jobs available in Central Massachusetts and 139, 000 nationally); or (ii) a surveillance system monitor (the VE had no data for local jobs, but 9,000 would be available nationally). *Id.*, at 608-09.

The ALJ amended the hypothetical to provide that the individual suffered from chronic pain and potential side effects of various medications and was off task for at least 33% of the work day, the VE testified that these additional limitations would eliminate any occupations. *Id.,* at 609-10. Mascia's counsel then asked whether an individual with the limitations in the ALJ's original hypothetical who were off task 20% of the work day due to chronic pain and side effects of various medications would be employable. The VE testified that such limitations would eliminate all occupations. *Id.*, at 610. Counsel for Mascia also asked whether an individual who takes unscheduled breaks of 15-20 minutes up to three times a day in addition to normal work breaks

would be employable. The VE testified that such individual would be eliminated from all occupations. *Id.*, at 610-11.

*ALJ's Factual And Legal Findings*

The ALJ made the following conclusions of law; unless otherwise specified, the ALJ made the findings through the date last insured (December 31, 1996):

(1) The claimant met the Act's insured status requirements on December 31, 1996 (his date last insured).

(2) The claimant has not engaged in "substantial gainful" employment from January 10, 1991 (date of alleged onset of disability) through date of last insured.

(3) The claimant had a sever impairment— degenerative disc disease.

(4) The claimant did not have an impairment or combination of impairments that met or medically equaled one from the list of impairments; the claimant's impairment does not meet or equal in severity the applicable requirements.

(5) The claimant had the residual functional capacity ("RFC") to perform sedentary work. The claimant has the following restrictions: must be able to sit/stand at will, no greater than occasional use of ramps, stairs, stooping or crouching. The claimant could not use ladders, ropes, scaffolding and could not do overhead lifting or reaching.

(6) The claimant was unable to perform any past relevant work.

(7) The claimant was 45 years old, which is defined as a younger individual.

(8) The claimant has at least a high school education and can communicate in English.

(9) Transferability of job skills is not material because using the Medical Vocational Rules as a framework supports a finding that the claimant is not "disabled" whether or not he has transferable job skills.

(10) Considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that claimant could have performed.

*Id.*, at 21-24.

In determining that Mascia had the RFC to perform sedentary work, the ALJ found that Mascia's medically determinable impairment could reasonably be expected to cause the allege symptoms. At the same time, the ALJ found that Mascia's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC finding. *Id.*, at 23. The ALJ also found that Mascia's condition has worsened over the years, but that prior to December 2006 he would have been precluded from engaging in a modest range of activities. The record fails to establish that prior to that time, he would have been more limited than detailed in the ALJ's fifth finding set forth above. *Id.*, at 23-24.

Based on the VE's testimony, the ALJ found that given Mascia's age, education, work experience, and RFC, he would have been able to perform other work that existed in significant numbers in the national economy such as an addressor or surveillance monitor. Thus, the ALJ ultimately concluded that claimant was not under a disability within the meaning of the Act from January 10, 1991 through the date last insured (December 31. 1996). *Id.*, at 25.

## Standard of Review

### *Affirmance or Reversal of Commissioner's Decision*

Under § 205(g) of the Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. *See* 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if supported by substantial evidence and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). In applying the "substantial evidence"

standard, the Court must bear in mind that it is the province of the ALJ, not the court, to find facts, decide issues of credibility, draw inference from the record, and resolve conflicts in the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate ... to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro* v. *Sec'y of HHS.*, 76 F.3d 15, 16 (1st Cir. 1996).

*Standard for Entitlement to Disability Insurance Benefits*

In order to qualify for disability insurance benefits, a claimant must demonstrate that he is disabled within the meaning of the Act. The Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment(s) must be severe enough to prevent the claimant from performing not only his past work, but any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1). Furthermore, to be entitled to SSDI, a claimant is eligible for benefits where s/he demonstrates that s/he was disabled on or before the date before which s/he was last insured. 42 U.S.C. § 423(a)(1)(A). The claimant has the burden of establishing that s/he was disabled before expiration of his/her insured status. *Brunson v. Astrue*, 387 Fed.Appx. 459 (5th Cir. 2010).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or his physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in [Appendix 1 of the Social Security regulations]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
> These first three tests are "threshold" tests. If the claimant is working or has the physical or mental capacity to perform "basic work-related functions," he is automatically considered not disabled. If he has an Appendix 1-type impairment, he is automatically considered disabled. In either case, his claim is determined at the "threshold." If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no "Appendix 1" impairment (test 3), the SSA goes on to ask the fourth question:
>
> Fourth, does the claimant's impairments prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four steps of the analysis. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he

furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy. *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In making that determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

## Discussion

The parties do not dispute that Mascia has not been engaged in substantial gainful employment since January 10, 1991, that he has severe impairments, that he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, and that his impairment prevents performing in any past employment. Disagreement arises, however, in connection with step five of the sequential evaluation process, *i.e,* the evidence relied on by the ALJ in making his decision as to whether Mascia's impairment prevents him from performing other work of the sort found in the economy.

### *Scope of the Issues Raised In Mascia's Appeal*

Mascia argues that the ALJ's finding regarding his credibility, which the Court has summarized above, was inadequate to comply with the requirements of 20 CFR §§ 404.1529 & 416.929(c)(3)(i-vii).   More specifically, he contends that because the ALJ failed to cite specific reasons for his findings regarding his credibility determination, he (the ALJ) has committed reversible error.   Mascia further argues that the ALJ completely ignored the effect of Mascia's chronic pain and effect of his pain medication on his ability to work.   He contends that the ALJ's

14

failure is significant, because he ignored the VE's finding that an individual with chronic pain who suffered side effects from medications would be disabled from substantial gainful employment.[4]

The Commissioner, on the other hand, argues that there was substantial evidence in the form of treatment records and the opinions of two reviewing physicians to support the ALJ's finding. The Commissioner further argues that although the ALJ could have provided more details concerning his credibility determinations, the level of detail suggested by Mascia is not required.

<u>Whether The ALJ Erred In Determining That Mascia's Subjective Complaints Are Not Credible.</u>

Mascia acknowledges that when a claimant alleges that they are disabled as the result of a medical impairment and when the Commissioner alleges that the severity of the impairment is not reflected within the objective medical data, the credibility of the allegations must be weighed pursuant to the criteria set forth in 20 CFR §§ 404.1529 & 416.929(c)(3)(i-vii). Moreover, when evaluating a claimant's subjective complaints of a disabling impairment, the administrative law judge is required to consider the so-called "Avery Factors." *See Avery v. Secretary of Health and Human Serv.*, 797 F.2d 19, 23 (1st Cir. 1986). Specifically, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment other than medication the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other

---

4 If the Court determines that the Commissioner failed to meet his burden with respect to step 5 of the sequential analysis, *i.e.,* to establish that he can perform work that exists in the regional economy, he argues that this Court should remand the case for payment, rather than to further develop the record.

factors relating to the claimant's functional limitations and restrictions due to pain. *See Farris v. Barnhart,* No. 01-04-B, 2002 WL 449289 at *3-4 (D.Me. Mar. 25, 2002). Mascia argues that in this case, the ALJ failed to adequately consider one or more of the Avery Factors.

Credibility determinations require two steps: (1) the ALJ must conduct a proper inquiry into the claimant's symptoms of pain; and (2) the ALJ must articulate specific and adequate reasons for determining that the testimony regarding the symptoms of pain is not credible, or the record must be obvious as to the credibility finding. *See Rohrberg v. Apfel,* 26 F.Supp.2d 303, 309 (D.Mass.1998). Furthermore, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated this demeanor, and considered how that testimony fit with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987). In this case I find that the ALJ conducted a proper inquiry into Mascia's subjective allegations of pain. Specifically, he asked him detailed questions about his symptoms, factors that aggravated his pain, medications he was taking to control the pain, other treatments he has undergone to attempt to manage the pain, and his daily activities. For the reasons set forth below I find that the ALJ articulated specific and adequate reasons for deciding not to credit Mascia's testimony, and/or that the record is obvious as to the credibility finding.

The ALJ determined that while Mascia's medically determinable impairment could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of his symptoms were not credible. The ALJ then found that before December 31, 2006, Mascia would have been able to engage in light work (Mascia's date last insured was December 31, 1996.) In so finding, he cited to the medical records from 1994-1998, which indicate that the L3-4 interbody-facet spine fusion performed by Dr. Wilkinson

16

was a success, that he had some pain relief and that using a back brace and the TENS unit helped with the pain. Furthermore, the ALJ noted that Dr. Liu stated that while Mascia's chronic back pain interfered with his day to day activities, he was able to walk three miles a day. I agree that the ALJ could have provided greater detail with respect to the *Avery* factors, but his decision both as to the claimant's credibility and his ultimate conclusion that claimant is not disabled are substantially supported by the record.

First, the medical records from the relevant time period support a finding that the surgery on Mascia's back, subsequent therapy, use of the TENS device and a back brace all helped to alleviate his lower back pain. Furthermore, per-radicular steroid injections provided significant improvement, albeit for a limited period (from 6- 8 months). Despite his alleged intense chronic pain, he failed to follow up on Dr. Wilkinson's referral to the UMASS pain control center and did not engage in ongoing therapy for his back. From 1998 until approximately 2006, Mascia did not seek any medical treatment for his back. Such conduct is inconsistent with someone suffering the intense pain testified to by Mascia. Furthermore, in October 1996, Mascia saw Dr. Liu and reported to her that he had considerable relief in pain since his surgery. In 1997, Dr. Wilkinson noted that Mascia was reporting mild lumbar pain.

As to daily activities, during the relevant time period, he told Dr. Liu that his pain increased when he was active, yet he was able to walk three miles a day. In the first RFC, it was noted that Mascia's records reflected that in January 1995, Mascia was pleased with his progress, but still had some tingling sensation in his lower leg and in June 1996, he was almost totally relieved of pain and could ride his horse gently with the aid of a corset. Mascia's testimony before the ALJ concerning the level of pain he has experienced over the years, the extent to which any medication, therapy or treatment has ever alleviated his pain, his testimony about the extent of sensations or

lack thereof that he feels in his left leg and his testimony concerning his daily activities since his injury is inconsistent with, and often contradicted by, the medical evidence. Furthermore, it is clear that Mascia has provided contradictory and inconsistent information to his various medical providers over the years concerning his condition and, as detailed below, his testimony concerning the side effects of his pain medication is inconsistent and/or contradicted by other evidence. Therefore, I find that the ALJ's determination as to Mascia's credibility is more than substantially supported by the record.

     Mascia takes issue with the ALJ's failure to adequately address the extent to which side effects of his pain medication effects his ability to perform even light work. It is true that the VE testified that an individual who suffered from chronic pain and side effects of various medications that required him to be off task at least 20% of the work day would be unemployable. At the hearing before the ALJ, Mascia testified that his pain medications make him "drowsy," "very tired." *Tr. at 584, 607.* However. Mascia does not cite to any other evidence in the record which would support a finding that side effects related to any medications affected his ability to work. This is not surprising since upon careful review of the record, the Court could find scant evidence that he was, or is, on any pain medication and/or that he suffered from any side effects from any medication that would affect his ability to work. More specifically, the only reference that the Court could discern from the record concerning the side effects of any medications are: (i) Dr. Liu noted that Mascia had been prescribed Voltaren and Naproyn (both anti-inflammatory medications) and that he reported side effects which he was not specific about; (ii) Elavil (anit-depressant) and baclofen (muscle relaxant) reportedly made him nauseous or left him groggy; (iii) too much Advil caused him GI distress; and (iv) he had discontinued Lipitor because of muscle aches and pains. The only one of these medications that Mascia continued to take was

Advil.  On March 7, 2006, Mascia filled out a pain questionnaire (or answered questions which were completed by someone else) in which he stated that he was taking Hydrocodone and Advil and that side effects included drowsiness and irritability. *Id.*, at 168.   However, Mascia filed a disability report with his application for benefits in February 2006 which listed all of his medications, including medications he was taking for pain (Hydrocodone), in which he indicated that there were no side effects. *Tr.*, at 154.   In a second disability report filed in June 2006, Mascia again listed all of his medications, including medications he is taking for pain (Hydrocodone) and indicated that there were no side effects.   Finally, in a third disability report submitted in 2006 (of unspecified date, but after the June 2006 report), Mascia again listed all of his medications, including his medications for pain (Advil, aspirin and Hydrocodone) and indicated there were no side effects.

There is evidence in the record which would support a finding that side effects of Mascia's medication should have been considered by the ALJ for purposes of determining whether he could perform even light work.   At the same time, there is substantial evidence in the record to support a finding that his medications did not produce any side effects which would affect his ability to perform light work. In such a case, this Court cannot substitute its judgment for that of the ALJ.   Therefore, I find that the ALJ did not err when he ignored the VE's finding that an individual with chronic pain who suffered side effects from medications would be disabled from substantial gainful employment.   Put another way, there is substantial evidence in the record to support the ALJ's finding that Mascia had an RFC to perform sedentary work.

Having carefully reviewed the administrative record, as well as the parties' arguments, I find that the record substantially supports that ALJ's determination that Mascia was not disabled and therefore, not entitled to benefits. Therefore, Mascia's motion seeking to reverse the

Commissioner's decision is denied and the Defendant's motion to affirm the order of the Commissioner is allowed.

## Conclusion

For the foregoing reasons, the Plaintiff's Motion To Reverse The Decision Of The Commissioner Of Social Security (Docket No. 15) is ***denied*** and Defendant's Motion For Order Affirming Commissioner (Docket No. 18) is ***allowed***.

/s/   **Timothy S. Hillman**
TIMOTHY S. HILLMAN
DISTRICT JUDGE